SIMMONS *v.* STATE.

(Division A. March 8, 1943.)

[12 So. (2d) 139. No. 34949.]

Means Johnston, of Greenwood, and Tandy Yewell, of Carrollton, for appellant.

400.

Greek L. Rice, Attorney General, by R. O. Arrington, Assistant Attorney General, and H. Talbot Odom and F. M. Witty, both of Greenwood, for the appellee.

Argued orally by **Means Johnston**, for appellant, and by **H. Talbot Odom**, for appellee.

Per Curiam:—The appellant, F. W. Simmons, was indicted, tried and convicted on a charge of the murder of W. K. Sims, and sentenced to life imprisonment in the state penitentiary. The record of the trial is most unusual, if not unique, because of the absence of so many issues and questions which frequently appear in the trial of a case of this character. There was neither a motion for a change of venue nor for a continuance. No error is assigned because of either the manner of impaneling the jury or as to the qualifications of the jurors. No bill of exception was taken, nor motion made for a mistrial to be entered. No complaint is here made in regard to the admission or rejection of testimony, nor to any alleged unfair argument of counsel, the giving or refusing of any instructions, or as to other rulings of the court, except that it is contended that the trial court should not have submitted to the jury the guilt or innocence of the accused for a greater offense than that of manslaughter; that is to say, it is urged that unless the homicide was committed by the appellant at a time when it reasonably appeared to him to be necessary in order to protect his life or to save himself from great bodily harm, then the evidence is only sufficient to sustain a conviction of manslaughter. Two of the justices, the writer and Chief Justice Smith,

are of the opinion that the issue should have been thus limited, while Justice ROBERDS, although not agreeing with this view, is of the opinion that the case should nevertheless be reversed and remanded for a new trial on the ground that the verdict of conviction for murder is against the great weight of the evidence. In other words, the judges are all in agreement that the case should be reversed and remanded for the reasons hereinafter stated.

The unfortunate tragedy occurred under the following circumstances: Prior to the difficulty in which the homicide occurred, the appellant and the deceased, W. K. Sims, were neighbors and good friends, peaceable and law-abiding citizens, and owned plantations and resided about two miles from each other. Mrs. Bruce, in front of whose residence the killing occurred, lived about midway between the plantations of the appellant and the deceased. Two days prior to the difficulty, the appellant had purchased two calves at private sale from Mr. Watson, a livestock commission merchant at Greenwood, and on the day before the killing one of them had strayed onto the plantation of Mrs. Bruce. She telephoned Mr. Watson, gave him the tag number of this calf and asked that he assist her in locating the owner, for the calf needed to be placed with a cow for its necessary sustenance, and she was informed by Mr. Watson that he definitely recalled having sold on the day before a white-faced calf to the appellant. The calf in question did not meet that description, but it was agreed that he would check his sales records and ascertain to whom he had sold this particular calf and would let Mrs. Bruce know the result of his investigation. He found that he had sold this calf also to appellant but instead of informing Mrs. Bruce to that effect, he chanced to meet William Simmons, the son of the appellant, on the next day in Greenwood, and conveyed the information to him. In the meantime, the appellant in making a general search in the

neighborhood for the calf visited the plantation of Mrs. Bruce and learned that the calf was there, but upon being requested by a negro woman not to take it from the place until Mrs. Bruce, who was a school teacher, should return from school that afternoon, he returned to his home without taking it with him. When his son William returned from Greenwood, the appellant was in the field where he had quite a number of cotton pickers at work, and William reported the incident to his mother, who suggested that he go and get the calf, thinking that it would be all right with Mrs. Bruce and that she wanted the owner to send for it. He went to the plantation of Mrs. Bruce, got the calf and brought it back to his father's place, without having seen or obtained permission from Mrs. Bruce so to do, and without having obtained the permission of the deceased, who was a relative of the late Mr. Bruce and was assisting and advising Mrs. Bruce about the operation of her plantation business. The deceased learned from Mrs. Bruce in the late afternoon before the killing occurred that night that she had been informed by the negro woman that "Mr. Simmons" (referring to the son William Simmons who was 28 years of age) had gotten the calf that afternoon, and the deceased became somewhat incensed about the matter and went to the home of the appellant, accompanied by his wife, but not at the request of Mrs. Bruce, and left a message with the wife of the appellant for him to meet him at the home of Mrs. Bruce on the next morning at eight o'clock to discuss the matter of the appellant having gone to her home and moved the calf without permission. He was then informed by the wife of the appellant that she had sent her son William for the calf and that the appellant had not taken it from the premises of Mrs. Bruce. It appears that some reference is made in the record to Bruce's Store and it seems that the wife of the appellant got the impression from the deceased that the appellant was wanted at the home of Mrs. Bruce on the next morn-

ing to meet court to answer charges about taking the calf, and when she told the deceased that she had sent her son for the calf, she was then told that she too could come and answer the charge. Upon the return of the appellant from his field shortly thereafter, his wife informed him that the deceased, accompanied by some lady, whom she evidently thought was Mrs. Bruce, had been to their home and that the deceased, a deputy sheriff of the county, was mad and had left the message above referred to. The appellant had come from the field in his automobile, where he had been paying off with cash some thirty-odd negro cotton pickers, many of whom were strangers, and had consequently carried his pistol in the car. Thereupon, the appellant and his wife decided to go to see Mrs. Bruce to try to make a satisfactory adjustment of the matter and drove forthwith to her home, parking their car on the driveway in front of the house, and, upon learning that she was in the kitchen, went around the house to talk to her about the matter. After some discussion of the incident with her, they then returned to their automobile to find that the deceased and his wife had driven their car onto the driveway and had stopped immediately behind the car of the appellant. There is no testimony to indicate that the appellant had any reason to suspect that he would see the deceased when he went to the home of Mrs. Bruce, or that he had his pistol in the car for the purpose of using it in any difficulty with the deceased. The testimony of the wife of the deceased shows that he got out of the car when he recognized the appellant and his wife and started the quarrel with the appellant about the calf, accusing him of having shown Mrs. Bruce but little respect in coming over there that afternoon and getting the calf from her place without permission, whereas the appellant had not in fact done so, as heretofore stated. It is further shown that, thereupon the wife of the appellant informed the deceased that she and the appellant had already talked to Mrs.

Bruce about the matter and that there was no use having any disturbance about it. That the deceased then stated to the wife of the appellant that she should keep quiet and let him and the appellant talk. One word brought on another until Mrs. Bruce, who was then in the kitchen washing dishes, heard loud voices at the front to such an extent that she became alarmed and sensed that there was trouble, and with the result that she left the kitchen and went through the house to the front porch in time to see the appellant standing on the opposite side of the hood of his own car from where she was standing on the porch when he fired the fatal shots. Mrs. Bruce testified, as a witness for the state, that she saw the appellant very distinctly and that he was about half way between the windshield and the front of the hood of his car when he did the shooting. The wife of the deceased testified that she and her husband stopped their car about four feet behind the appellant's car, and also testified on cross-examination that the deceased was within about five or six feet of the appellant at the time of the shooting, showing that the deceased had advanced from the side of his own car toward the appellant for some considerable distance before the shooting occurred. Mrs. Bruce, appellant and his wife, all testified that the shots were fired as rapidly, as one could pull a trigger, and both the appellant and his wife testified in effect that the loud voices that Mrs. Bruce had heard from her kitchen was the cursing by the deceased of the appellant. It was shown by the testimony of the wife of the deceased that the appellant was at the front door of his own car when the controversy started. It was not shown that he ever advanced from there toward the deceased, but that he had stepped back toward the front of his own car when the shooting occurred.

Thus it will be seen that the entire controversy was "Much Ado About Nothing," and that the killing occurred as the result of a sudden and unexpected meeting of the deceased and appellant on that occasion.

In view of the conclusion that we have reached, and on account of the fact that the case is to be reversed for a new trial, we shall refrain from reviewing all of the details of the testimony as to what was said and done at the scene of the alleged crime, other than to say that the conflict in the evidence relates primarily to the rapidity with which the shots were fired, the contrary versions given by the wife of the deceased and the other witnesses as to the character and violence of the language, accusations and demonstrations alleged to have been made by the deceased toward the appellant immediately preceding the shooting, and other less important details of the controversy.

It also appears from the record that one Simon Lacey, a negro tenant on the plantation of Mrs. Bruce, was present about the scene of the homicide, and that he was not introduced by the state as a witness, upon the theory that he was under intimidation at the time of the trial, but due to no fault of appellant or anyone else connected with the·defense, it being alleged that such intimidation was due to the influence of other persons. We pretermit further comment on this point, since it is not assigned here as error, nor argued in the briefs.

As heretofore stated, it was shown that the deceased was a regular deputy sheriff of the county, and the proof shows that he customarily carried a pistol, as he had a right to do as such officer. It was found, however, that he was unarmed on the occasion when he came to his death.

The state obtained an instruction as to the different forms of a verdict that would be authorized under the law in the event the appellant was found guilty of murder, and obtained a separate instruction to the effect that "manslaughter is the killing of a human being in the heat of passion, without malice, by use of a dangerous weapon, without authority of law, and not in necessary self-defense; and if the jury believe from the evidence beyond

a reasonable doubt that the defendant F. W. Simmons so killed the deceased W. K. Sims, then the jury will find the defendant guilty of manslaughter.'' It was therefore unnecessary that the defendant should have requested or obtained an instruction on manslaughter in order to avail himself of his objection to the other instructions on behalf of the state which submitted to the jury the issue of his guilt or innocence of the crime of murder.

From what we have already said, it follows that the cause must be reversed and remanded for a new trial.

Reversed and remanded.